## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| MAGNA INVESTMENT & DEVELOPMENT, LTD, a Utah limited partnership<br><br>Plaintiff,<br><br>v.<br><br>SANDY CITY, a municipal corporation of the State of Utah,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Case No. 2:24-cv-00449-RJS-CMR<br><br>Judge Robert J. Shelby<br><br>Magistrate Judge Cecilia M. Romero |

Now before the court is Plaintiff Magna Investment & Development, LTD (Magna)'s Motion for Partial Summary Judgment[1] and Defendant Sandy City (City)'s Cross-Motion for Partial Summary Judgment.[2]  For the reasons set forth below, the court GRANTS Plaintiff's Motion, DENIES the City's Cross-Motion, and remands to the Planning Commission for further proceedings.

## FACTUAL BACKGROUND[3]

This case arises from a permitting dispute for a mixed-use development in Sandy City, Utah.  The facts in the Motions are largely undisputed.[4]  The City disputes some facts set forth

---

[1] Dkt. 24, *Motion for Partial Summary Judgment* (*Magna MSJ*).

[2] Dkt. 26, *Sandy City's Cross-Motion for Partial Summary Judgment*.

[3] The facts are drawn from the parties' briefing and attached exhibits.  *See generally* Fed. R. Civ. P. 56(c).  "When the parties file cross motions for summary judgment, [the court is] entitled to assume that no evidence needs to be considered other than that filed by the parties."  *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (quoting *James Barlow Fam. Ltd. P'ship v. David M. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997)).  On motions for summary judgment, the court "must construe the facts in a way most favorable to the nonmovant," and cross-motions are treated separately.  *Buell Cabinet Co., Inc. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979).

[4] Dkt. 27, *Memorandum Opposing Plaintiff's Motion for Summary Judgment and Supporting Sandy City's Cross-Motion* (*Sandy MSJ*), at 6–7 ("For the purposes of the present motion, and with the exception of several

by Magna, but only to the extent they invite the court to draw legal inferences.[5]  With

consideration of the parties' responses to their respective statements, the court sets forth the

following facts as undisputed.

### A.  The Property and Relevant City Ordinances

Magna owns approximately 6.21 acres of land in the City (Property).[6]  The City is divided into

multiple defined zoning districts to regulate the City's development.[7]  The Property is in the

Neighborhood Commercial District (CN).[8]  The City's Land Development Code (LDC) provides

that CNs are "established to allow for the creation of commercial centers to serve the

convenience shopping and service needs of neighborhood areas of Sandy City within planned

commercial centers.  The [CN] designation is intended for commercial developments that will

relate to residential neighborhoods and will be compatible with residential character."[9]

The City has also established and regulates Mixed Use Districts (MUs).[10]  The LDC

provides that MUs are:

> (1)  [Districts] established to provide a zone to be used near City transportation
> corridors that allow[] a mix of specific land uses that are typically found
> separately in mutually exclusive zoning districts.  Mixed use represents a

---

clarifications regarding Magna's Statement of Undisputed Facts (SOF) ¶¶ 4, 6–15, 17–18, and 27, . . . Sandy City
does not dispute Magna's SOF.").

[5] *See, e.g.*, *Sandy MSJ* at 7 ("The parties may ask the Court to draw different inferences from the Record and facts
therein, and the City's responses to ¶¶ 6–15 and 27 below highlight where Magna asks the Court to draw
unwarranted inferences or inaccurately characterize the Record."); *id.* at 8 (responding to Magna's ¶¶ 6–15 as
"conclusive assertions that most elements of [the mixed use development definition] are met" and by making these
assertions "Magna asks the Court to assume what Magna needs to demonstrate"); *id.* at 9 (stating "Magna's ¶ 17 is
incomplete" and providing additional information from a supplemental report).

[6] Dkt. 4, *First Amended Petition for Review and Complaint* (*Amended Complaint*) ¶ 6; *Motion* ¶ 1.

[7] *See* 45-1, *2021 Sandy City Code – Title 21 Land Development Code* (*LDC*) § 21-4-11 (defining the City's
"standard commercial, office, and industrial districts"); *id.* § 21-8-2 (providing a matrix of permitted land uses for
each City district).

[8] *Amended Complaint* ¶ 9; *Motion* ¶ 3.

[9] *LDC* § 21-4-11(6).  The Sandy Code has been modified since this development dispute arose.  The court cites to the
City ordinances as they existed at the time, as provided by the parties.  *See Magna MSJ* at 4 n.3.

[10] *LDC* § 21-4-11(14).

> departure from characteristic zoning to the extent that it encourages a combination of land uses which might normally be regarded as incompatible.
>
> (2)  The intent of these zones is to create self-sustaining villages that become walkable neighborhoods, in which residents may walk to work, to shopping, to recreational facilities, and have access to mass transit.  These neighborhoods are to provide a variety of housing opportunities and choices that include a range of household types, family sizes, and incomes.  They shall provide convenient pedestrian commercial services, employment opportunities and shall be located in areas with existing, or probable future, multiple transportation choices.  Design standards include requirements that help provide a true neighborhood by stipulating various mix of uses, build to lines, compact building design, preservation of open space, pedestrian-friendly streets and streetscape, parking concealment, architectural control, and maintenance.  Proposed developments with increased land intensity and housing density but without the above walkable elements are unacceptable and will not be approved.[11]

Both CNs and MUs fall under the general umbrella of Commercial, Office, Industrial, Mixed use, Transit corridor, and Research and Development Districts.[12]  LDC Section 21-8-2 contains a matrix listing the permitted land uses within these districts.[13]  According to the matrix, mixed use development is a permitted land use in MUs and permitted on a conditional basis in CNs.[14]

The LDC includes a section on general commercial and industrial development standards that lists the "general . . . requirements, as well as the development requirements listed in the individual districts," including CNs.[15]  The general development standards (GDS) list requirements for, among other things, a site plan review, architectural design, locations and

---

[11] *Id.* § 21-23-24(a).

[12] *See id.* § 21-8-2.

[13] *Id.*

[14] *See id.*  Mixed use development is also a permitted land use in several other Districts, including the following: Central Business District—Arts and Culture Subdistrict; Commercial Neighborhood—Historic Sandy Neighborhood; and Historic Business.  *See id.* §§ 21-8-2, 21-4-11.  Additionally, mixed use development is a conditional use in several other Districts, including Central Business; Central Business—Parkway; Central Business—Office Subdistrict; Regional Commercial—Planned United Development; Regional Commercial; Boulevard Commercial; Community Commercial; Limited Commercial; and Research and Development.  *Id.* §§ 21-8-2, 21-4-11.

[15] *Id.* § 21-23-3.

setbacks, and lighting.[16]  LDC Section 21-23-21 provides additional specific development standards for nonresidential districts listed by district,[17] but "[n]o additional development standards are required in the CN District" other than the GDS.[18]  The GDS do not mention a master plan or vertical or horizontal mixed use development except as listed for specific districts,[19] nor do they include any references to "villages."[20]  Additionally, while the GDS section and § 21-23-23 provide information on the development standards for CNs,[21] neither section includes any mention of development standards for the MU District.[22]  However, there is a separate section, § 21-23-24, that is titled "Mixed Use Development Standards."

Section 21-23-24 includes the following subsections: purpose and intent; procedures; land coverage; uses allowed; development standards; environmental concerns; requirements unique to residential uses; and service areas.[23]  The subsection detailing the development standards state the "standards are to be considered as applying specifically to development in the Mixed Use (MU) District, in addition to general standards provided elsewhere in this title."[24]

---

[16] *Id.* § 21-23-3.

[17] The Districts subject to additional development standards within the GDS include: the Central Business District; Automall District; Neighborhood Commercial—Historic Sandy Neighborhood District; Historic Business District; Boulevard Commercial District; Limited Commercial District; Professional Office District; Industrial Development District; and the Research and Development District. *See id.* §§ 21-23-21(a), (b), (g), (h), (i), (j), (l), (m), (o).

[18] *Id.* § 21-23-21(f).  *Compare id.*, *with* § 21-23-21(h) (detailing additional development standards for the Historic Business District), *and* § 21-23-21(i) (detailing the same for the Boulevard Commercial District), *and* § 21-23-21(o) (detailing the same for the Research and Development District).

[19] *See e.g.*, *id.* §21-23-3(6)(a)(1) (listing the overall master plan as a consideration for setback modifications); *id.* § 21-23-3(6) n.6 (stating "[m]ultifamily buildings (including vertical mixed use buildings that contain residential uses) may be allowed up ton 140 feet without restriction on the number of stories").

[20] *See generally* § 21-23-23.

[21] *See e.g.*, § 21-23-3(4) (listing the general building locations and setbacks for CNs); *id.* § 21-23-21(f) (stating that no additional standards are required for CNs other than the GDS).

[22] *See generally id.* §§ 21-23-21, 21-23-23.

[23] *See id.* § 21-23-24.

[24] *Id.* § 21-23-24(e).

The "purpose and intent" subsection contains language that is virtually identical to the description of MU Districts in § 21-4-11, including the creation of "self-sustaining villages that become walkable neighborhoods."[25]  Section 21-23-24 provides that MUs require a master plan,"[26] and that the "actual blend of vertical and/or horizontal mixed use development shall be determined by the Planning Commission depending on the size, scale, and location of the development."[27]

The next to the last chapter of the LDC contains "General Definitions and Terms."[28] "Mixed use development" is defined as:

> [A] development project that includes residential and one or more of the following land uses: retail, service, commercial, or office; and which, vertically or horizontally, integrates critical massing of physical and functional components into a coherent plan that promotes walkability through uninterrupted pedestrian connections, and reduces traffic and parking impacts.[29]

The definition for "mixed use development" is sandwiched between four other "mixed use" definitions—"mixed use, commercial and residential development,"[30] "mixed use, residential

---

[25] *Compare id.* § 21-23-24(a)(1–2), *with id.* § 21-4-11(14).

[26] *Id.* § 21-23-24(e)(1) ("Regardless of the size and ownership of individual parcels, a walkable Mixed Use Master Plan must be submitted to the Planning staff for review and approval by the Planning Commission.").

[27] *Id.* § 21-23-24(d)(1)(b).

[28] *Id.* § 21-37-1.  The last chapter of the LDC is the "Sports and Recreation Overlay Zone."  *See id.* Chapter 21-38.

[29] *Id.* § 21-37-14(11).

[30] *Id.* § 21-37-14(10) ("*Mixed use, commercial and residential development*, means a development consisting of a mixture of residential and commercial use with an approved ratio, developed according to a master site plan.  The development of the uses is of sufficient size and physical improvement to protect surrounding areas and the general community, and to ensure a harmonious integration into the neighborhood.").

and office use,"[31] "mixed use, horizontal,"[32] and "mixed use, vertical."[33] "Mixed use, commercial and residential development," and "mixed use, residential and office use," both require "uses with an approved ratio, developed according to a master site plan"[34]; and both "mixed use, horizontal" and "mixed use, vertical," development must be "designed in a village manner."[35]

### B. Magna's Application

On December 28, 2021, Magna submitted a conditional use permit application to construct a mixed-use development project (Project) on the Property.[36] The Project integrated "two or three different [land] uses,"[37] including residential, retail, and office space.[38] The Project also included several paths, trails, cross walks, sidewalks, and a pedestrian bridge to a school property.[39]

On March 21, 2023, the City informed Magna that City staff intended to seek an interpretation of the term "mixed-use" as applied to the Project before scheduling a hearing on

---

[31] *Id.* § 21-37-14(13) ("*Mixed use, residential and office use*, means a development consisting of a mixture of residential and office uses with an approved ratio, developed according to a master site plan. The development of the uses is of sufficient size and physical improvement to protect surrounding areas and the general community, and to ensure a harmonious integration into the neighborhood.").

[32] *Id.* § 21-37-14(12) ("*Mixed use, horizontal*, means commercial and residential uses, etc., which are in close proximity to each other and designed in a village manner, but not necessarily within the same building structures.").

[33] *Id.* § 21-37-14(14) ("*Mixed use, vertical*, means commercial, office, or residential uses, etc., designed in a village manner which are within close proximity to each other within the same building structure.").

[34] *Id.* § 21-37-14(10), (13).

[35] *Id.* § 21-37-14(12), (14).

[36] *Amended Complaint* ¶ 7. Two ordinances of the 2021 LDC were amended before Magna submitted its application, but neither made any changes to CN or MU requirements. *See LDC* at 421–433 (containing ordinances 21-33 and 21-36 amending certain requirements related to flood plains and permitting more flexibility for setback requirements in the Central Business District respectively).

[37] *Sandy MSJ* ¶ 5.

[38] *Id.* ¶¶ 5, 7.

[39] *Magna MSJ* ¶¶ 10, 12, 14–15; Dkt. 13-4, *Record of Proceedings by Sandy City Appendix R0858-R1079* (*App'x 4*), at R1072.

Magna's application.[40]  The City's staff prepared two reports for the Planning Commission—one dated April 20, 2023, and another dated August 3, 2023—and recommended that the Planning Commission conclude the Project was not a mixed-use development.[41]  The April report concluded the definitional standard of "mixed use development" was "informed by the statutory definitions of related terms in the City Code."[42]  The August 2023 report supplemented the April report.[43]

Prior to the Planning Commission's meeting, Magna requested that a neutral third party—the Ombudsman—provide an opinion on whether Magna's proposed Project complied with the definition of "mixed use development," and whether Magna was entitled to have its application for the Project processed.[44]  The Ombudsman concluded the LDC's definition of "mixed use development" is a land use in the CN and, by including the related "mixed use" definitions in its interpretation, the City incorrectly imposed MU District requirements "to determine that the Project was not a compliant mixed-use development."[45]

---

[40] *Magna MSJ* ¶ 16.

[41] *Id.* ¶ 17.

[42] *Sandy MSJ* ¶ 4.

[43] *Id.* ¶ 5.  Magna states that the August 2023 report included Findings as outlined below and the City states the Findings were listed in a report submitted in March 2024.  *See Magna MSJ* ¶ 18; *Sandy MSJ* response to *Magna MSJ* ¶ 18.  The parties' briefing does not include any other information regarding the August 2023 report.  Because the Sandy MSJ states the March 2024 report "largely mirrors the prior reports" and the exact date of the recommended Findings is not material to the court's conclusions, the court attributes the Findings to the March 2024 report.

[44] *Magna MSJ*, *Additional Undisputed Facts* ¶ 1; *see also* Utah Code § 13-43-205(1) (stating a private entity may request a written advisory opinion from a neutral third party to determine compliance with Utah Code § 10-9a-507 before a final decision on a land use application); Utah Code § 10-9a-507(2)(a)(i) ("A land use authority shall approve a conditional use if reasonable conditions are proposed."); Dkt. 25-1, *Appendix of Evidence in Support of Motion for Partial Summary Judgment Ex. 1*, *Ombudsman Advisory Opinion* (*Ombudsman Opinion*) at 1.

[45] *See Ombudsman Opinion*.

City staff submitted another supplemental report on March 7, 2024, which largely mirrored the prior reports.[46]  The March 2024 report outlined six findings (Findings) why the Project did not qualify as "mixed use development."[47]  Specifically, the report stated:

A.  A mixed-use development must consist of more than just a collection of types of uses that are adjacent (vertically or horizontally) to one another.  It requires that they be designed to function as a walkable village center providing a variety of housing, employment opportunities, goods, and services that support the existing and proposed residents of a given area (see Sec. 21-37-14(10–14) & 21-23-24).  The proposal does not meet this requirement.

B.  A mixed use development is required to function as a walkable village center, providing a mix of uses within close proximity, and uninterrupted pedestrian connections, thereby reducing traffic and parking impacts (see Sec. 21-37-14(10-14) & 21-23-24).  The proposal does not meet this requirement.

C.  A mixed use development requires coordination and master planning to successfully create a walkable community (see Sec. 21-37-14(10–14) & 21-23-24).  The proposal does not meet this requirement.

D.  The development proposal does not meet the definition of a "Mixed Use Development" as found in section 21-37-14(10-14).

   i.  The proposal shows that there has been no effort to coordinate and master plan with surrounding property owners and integrate those existing uses or future development.  After evaluating this proposal within its development area only, and not including the surrounding existing properties and uses, and finds there is not a sufficient mix of uses.

   ii.  The proposal is not of sufficient size and physical improvement to protect surrounding areas and the general community, and to ensure a harmonious integration into the neighborhood.

   iii.  The proposal does not integrate critical massing of physical and functional components into a coherent plan that promotes walkability through uninterrupted pedestrian connections and reduces traffic and parking impacts.

   iv.  The proposal is not designed in a walkable village manner.

   v.  The proposal shows "live/work units" that are not designed to function as such because the spaces are disconnected.  The amount of area designated for "work" within these buildings is too small to function as standalone office space and will likely be utilized for storage and maintenance spaces.

   vi.  The amount of proposed retail uses represents only 6% of the overall building square footage (not including the structured parking areas).

---

[46] *Id.* ¶ 6.

[47] *Magna MSJ* ¶ 18 (stating the Findings); *Sandy MSJ* ¶ 18 (clarifying that the Findings were included in the March 2024 report).

      vii. The amount of live/work "office" space represents only 1% of the overall building square footage (not including the structured parking areas).

E. This development proposal is focused on creating a multi-unit dwelling development, which is a use that is not permitted as a standalone use in the CN Zone (see Sec. 21-8-2). It does not provide sufficient office/retail elements to serve the purpose of the CN zone (see Sec. 21-2-11(6)).

F. A development that is focused on commercial retail and office uses that harmoniously integrates a residential element into the overall development scope to create a village center would be an appropriate application of a mixed use development (see Sec. 21-2-11(6) & 21-23-24).[48]

The same day, March 7, 2024, the Planning Commission held a public meeting and interpreted the definitional standard of "mixed use development" to include the statutory definitions of the related "mixed use" terms.[49] Based on this interpretation, the Planning Commission concluded the Project did not qualify as "mixed use development" and denied Magna's application.[50] The Planning Commission's interpretation was based solely on the staff Findings which were incorporated by reference into the Planning Commission's motion.[51]

### C. Magna's Appeal

Magna appealed the Planning Commission's decision to the Board of Adjustment (BOA) pursuant to LDC § 21-35-1(c).[52] In preparation for the BOA review, the City's Community Development Department submitted a staff report (Report) to the BOA that provided background on the Project, an explanation of the Planning Commission's decision, a summary of Magna's arguments on appeal, and the legal standards for the BOA's review.[53] In explaining the Planning Commission's decision, the Report stated:

---

[48] *Magna MSJ* ¶ 18.

[49] *Sandy MSJ* ¶ 7.

[50] *Id.* ¶ 8.

[51] *Id.* ¶ 21; *Sandy MSJ* at 6 (stating the City does not object to Magna's ¶ 21).

[52] *Sandy MSJ* ¶ 9.

[53] *App'x 4*, R1068–74.

The Planning Commission's decision was based on the definitions of the LDC. The application of the Mixed Use Development standards is supplemental. The LDC contemplates different types and configurations of a mixed use development (horizontal, vertical, etc.) through various definitions listed under Sec. 12-37-14(10-14). Applying the LDC as a whole, the commonalities among all of them are that the same Mixed Use Development Standards, under Sec. 21-23-24, are applied consistently to all mixed use development.[54]

The Report also stated the BOA's standard of review. Specifically, the BOA was required to "determine the correctness of a decision of the land use authority or administrative official in its interpretation and application of a land use ordinance," and review factual issues according to an "arbitrary and capricious standard."[55] The Report summarized the legal standards as follows:

The Board's review of the Planning Commission's decision is to determine whether a reasonable mind could reach the same conclusion as the Planning Commission did, in light of the evidence the Planning Commission had before it. The Appellant must marshal all the evidence in support of their claim that the Planning Commission decision was made in error and show that in spite of the facts which support the decision, and in light of conflicting or contradictory evidence, the decision is not supported by substantial evidence. Substantial evidence is evidence which is adequate to convince a reasonable mind to support a conclusion.[56]

The Report recommended the BOA conclude the following:

The applicant has not met their burden of proving that the Planning Commission decision was so unreasonable as to be arbitrary and capricious. As stated in the ordinance cited, the appellant bears the burden of proving that the land use authority erred. It is not enough to show that one could reasonably reach a different conclusion on the facts if there is a reasonable basis for the decision reached by the Planning Commission.

Based on the foregoing, the [BOA] should conclude the Planning Commission did not err in making their determination that the applicant's project does not meet the definitional standard of a "mixed-use development" as outlined in the Land Development Code, and adopt the following findings:

1. The record of [the] decision is sufficient and not deficient as demonstrated in the referenced staff reports and associated exhibits and other information in the record; therefore, this matter can be reviewed on the record, and not de novo.

---

[54] *Id.* R1071.

[55] *Id.* R1073–74.

[56] *Id.* R1074.

2. The appellants have not shown that there was no reasonable basis to justify the action taken, and the determinations made were so unreasonable as to be arbitrary and capricious.

3. Based on the findings cited in their motion and evidence cited in the record, the Planning Commission determination was processed as required by the Sandy Land Development Code.

4. Therefore, the Planning Commission's decision was correct in its interpretation and application of the Land Development Code.[57]

On May 23, 2024, the BOA convened and affirmed the Planning Commission's decision.[58] Attorneys for Magna and the City both addressed the BOA at the hearing.[59]  The City's attorney, Ms. Alcorn, stated the Planning Commission determined the Project was not mixed use by "us[ing] the collection of definitions and cited to them in their findings."[60]  The Planning Director stated Magna had not included "the broader master areas" and Magna's attorney noted the definition for "mixed use development" does not have a master plan requirement.[61]  A BOA member observed the dispute seemed to rest on whether only the definition for "mixed use development" applied or whether all five "mixed use" definitions were relevant.[62]  Ms. Alcorn stated several times that the Planning Commission concluded § 21-23-24 also applied and relied on § 21-23-24 in their Findings.[63]

---

[57] *Id.*

[58] *Magna MSJ* ¶ 26.

[59] *See* Dkt. 23-1, *Notice of Supplement to the Record of Proceedings by Sandy City R1086-R1316 (App'x 5)*.

[60] *Id.* R1241.

[61] *Id.* R1089; R1189–90, R1245, R1258.

[62] *Id.* R1247.

[63] *See id.* R1241 ("We would say that [§ 21-23-24] that the Planning Commission also cited to . . . in its findings, indicat[es] that they disagree that it doesn't apply outside of the mixed-use district."); *id.* R1246–47 (containing a conversation between two BOA members and Ms. Alcorn in which Ms. Alcorn affirms the definition of mixed use "came down to" § 21-23-24 and "paragraph numbers ten, 11, 12, 13 and 14"); *id.* R1249 ("Ms. Alcorn:  So the ombudsman based the decision almost entirely on their opinion that [§ 21-23-24] was not applicable. . . . [T]he city staff did not agree.  Planning Commission referenced that section in their findings, which indicates to me that Planning Commission also did not agree with that opinion.").

Before voting, the BOA and its attorney discussed the standard of review the BOA should apply. The BOA's attorney stated it should review the legal question of "[w]hich definition applies" for correctness, giving no deference to the Planning Commission, and then review "whether the specific proposal fulfills the definition . . . under an arbitrary and capricious standard."[64] The BOA made two motions before coming to a unanimous decision. The first motion is not plainly stated, but consists of the following conversation:

> Mr. Edwards: Make a motion to the Planning Commission was correct [sic] in using the different definitions, including number ten, 11, 12, and 13. And that they did not act in a manner that was arbitrary and capricious — you know what I mean, and we find in favor of the Planning Commission.
> Mr. Jones: And the reasons why you find they didn't — or why you're moving that they didn't act arbitrarily and capriciously.
> Mr. Edwards: Because they acted according to what they thought there was a proper method of applying the five.
> Mr. Wilcox: If it's helpful to the board, there are some recommendations in as far as findings in our staff report there. If they if you so find those useful.
> Mr. Jones: So we have a motion. Do we have a second?[65]

Before voting on this motion, a BOA member pointed to the recommended Findings of the staff report, but the motion did not pass because one member concluded "the motion need[ed] to be more robust to stand up on appeal."[66]

The BOA then unanimously withdrew the prior motion and approved the following substitute motion:

> [W]e determine that the Planning Commission did not error in making its decision. [sic] Based upon the following findings. The appellants have not shown that there is no unreasonable basis to justify the action taken, and therefore, that the that [sic] the determinations made were so unreasonable as to

---

[64] *Id.* R1270; *see also id.* R1272 (discussing the application of a correctness standard to the Planning Commission's definitional interpretation of "mixed use development" and the factual question of whether the project fit the definition under an arbitrary and capricious standard); *id.* R1289 ("I would start with . . . the Planning Commission decision was correct in its interpretation of the Land Development Code. . . . And we find the record show that the Planning Commission also made a determination that this did not meet a mixed-use development.").

[65] *Id.* R1285.

[66] *Id.* R1286–87.

be arbitrary and capricious.  In other words, the Planning Commission decision was correct in its interpretation and application of the Land Development Code.  The Planning Commission decision was reasonable and based upon substantial evidence.[67]

The BOA Minutes state the motion and decision in terms that echo the Report:

> [T]he applicant has not met their burden of proving that the Planning Commission decision was so unreasonable as to be arbitrary and capricious.  As stated in the ordinance cited, the appellant bears the burden of proving that the land use authority erred.  It is not enough to show that one could reasonably reach a different conclusion on the facts if there is a reasonable basis for the decision by the Planning Commission.
> Based upon the foregoing, the [BOA] should conclude that the Planning Commission did not err in making their determination that the applicant's proposed project does not meet the definitional standard of a "mixed-use development" as outlined in the [LDC], and adopt the following findings:
> 1. The appellants have not shown there was no reasonable basis to justify the action taken, and therefore that the determinations were made so unreasonable as to be arbitrary and capricious.
> 2. The Planning Commission's decision was correct in its interpretation and application of the [LDC].
> 3. The Planning Commission's decision was reasonable and based upon substantial evidence including materials referenced by attorney Darien Alcorn in her rebuttal, including the full and complete record that has been reviewed in this case and that was available to the Planning Commission, including images, studies, scale drawings, etc.[68]

Having exhausted its administrative remedies,[69] Magna timely filed suit on June 21, 2024.[70]  On August 22, 2024, Magna amended its Complaint in which it petitioned for judicial review of the land use decision and asserted seven claims: (1) procedural due process violation of the Utah Constitution; (2) procedural due process violation of the United States Constitution; (3) substantive due process violation of the Utah Constitution; (4) substantive due process

---

[67] *Id.* R1289–92.

[68] *App'x 4*, R1082.  *Compare id.*, *with id.* R1074.

[69] *See LDC* § 21-35-1(a) (stating an administrative appeal is a condition precedent to judicial review).

[70] Dkt. 2, *Complaint*.

violation of the United States Constitution; (5) taking violation under the Utah Constitution; (6) taking violation under the United States Constitution; and (7) equal protection violation.[71]

Magna filed its Summary Judgment Motion on December 23, 2024, and the City filed its Cross-Motion on January 27, 2025.  In its Motion, Magna seeks summary judgment on its petition for judicial review and attorney fees pursuant to Utah Code § 13-43-206(12).[72]  In its Cross-Motion, the City also seeks summary judgment on Magna's judicial review petition, and argues the court should deny Magna's request for attorney fees.[73]  The Motions are fully briefed.[74]  The court heard oral argument on September 25, 2025.[75]  After carefully considering the parties' briefs and oral arguments, the court concludes partial summary judgment for Magna is appropriate.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if "there is no genuine dispute as to any material fact" and the moving party is "entitled to judgment as a matter of law."[76]  When parties file cross-motions for summary judgment, each party bears this burden,[77] and the motions are treated separately.[78]  A fact is material if, under the governing substantive law, it "might affect the outcome of the suit."[79]  When a party submits a supported

---

[71] *Amended Complaint* ¶¶ 54–220.

[72] *See generally Motion.*

[73] *See generally Cross-Motion.*

[74] *Magna MSJ*; *Sandy MSJ*; Dkt. 29, *Joint Reply in Support of Motion for Partial Summary Judgment and Opposition to Cross-Motion for Partial Summary Judgment* (*Magna Reply*); Dkt. 31, *Sandy City's Reply in Support of Cross-Motion for Summary Judgment* (*City Reply*).

[75] Dkt. 44, *Minute Entry.*

[76] Fed. R. Civ. P. 56(a).

[77] *Atl. Richfield Co.*, 226 F.3d at 1148.

[78] *Buell Cabinet Co., Inc.*, 608 F.2d at 433.

[79] *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

motion for summary judgment, "the adverse party must set forth specific facts showing that there is a genuine issue for trial."[80]  The court then "determin[es] whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[81]  In performing this threshold inquiry, the court "view[s] the evidence and make[s] all reasonable inferences in the light most favorable to the nonmoving party."[82]

## ANALYSIS

The parties dispute whether the BOA erred in its decision.  The court reviews the BOA's interpretation of the LDC for correctness.[83]  The court must "presume that a final land decision of a land use authority or an appeal authority is valid unless the land use decision is: (i) arbitrary and capricious; or (ii) illegal."[84]  "A land use decision is illegal if the land use decision (A) is based on an incorrect interpretation of a land use regulation; (B) conflicts with the authority granted by [Utah law]; or (C) is contrary to law."[85]

As a preliminary matter, the record before the court does not contain any official land use decision from the BOA.  Under Utah law, "[a] written decision, or other event as provided by ordinance, constitutes a final decision" for purposes of judicial review.[86]  The Utah Court of

---

[80] *Id*. at 250.

[81] *Id*.

[82] *N. Nat. Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008).

[83] *See Outfront Media, LLC v. Salt Lake City Corp.*, 416 P.3d 389, 394 n.13 (Utah 2017) (stating the court reviews the interpretation of ordinances for correctness because developments in the law have rejected affording deference to state agencies' interpretation of statutes and there is "less reason to defer to local agencies' interpretations of ordinances, given that those local agencies do not possess the same degree of professional and technical expertise") (cleaned up).

[84] Utah Code § 10-9a-801(3)(b).

[85] *Id.* § 10-9a-801(3)(c)(ii).

[86] *Id.* §§ 17-27a-708; 17-27a-801(2)(a).

Appeals has stated this imposes "a statutory duty to issue a written decision."[87]  The LDC does not specify what constitutes a BOA land use decision, though it does state the decision takes effect "[o]n the date when the [BOA] issues a written decision or approval of the minutes of the meeting at which the decision was made."[88]  The record contains a transcript of the BOA hearing, but no written decision or approval of the BOA minutes.[89]  Based on the BOA hearing transcript and the unofficial minutes contained in the record, the court assumes the BOA found Magna did not meet its "burden of proving the Planning Commission decision was so unreasonable as to be arbitrary and capricious" and "conclude[d] that the Planning Commission did not err in making their determination that the applicant's proposed project does not meet the definitional standard of a "mixed-use development" as outlined in the [LDC]."[90]

In determining the Planning Commission's decision was correct in its interpretation and application of the LDC, the BOA discussed and approved the Planning Commission's analysis and decision.  Accordingly, for purposes of this order, the court assumes the BOA affirmed the Planning Commission's interpretation of "mixed use development" based on its Findings:

A. A mixed use development must consist of more than just a collection of types of uses that are adjacent (vertically or horizontally) to one another.  It requires that they be designed to function as a walkable village center providing a variety of housing, employment opportunities, goods and services that support the existing and proposed residents of a given area (see Sec. 21-37-14(10-14) & 21-23-24).  The proposal does not meet this requirement.

B. A mixed use development is required to function as a walkable village center, providing a mix of uses within close proximity, and uninterrupted pedestrian connections, thereby reducing traffic and parking impacts (see Sec. 21-37-14(10-14) & 21-23-24).  The proposal does not meet this requirement.

---

[87] *Hatch v. Kane Cnty. Bd. of Adjustment*, 302 P.3d 146, 153 (Utah Ct. App. 2013) (citing Utah Code §§ 17-27a-708, 17-27a-801(2)(a)).

[88] *LDC* § 21-35-1(j)(2).

[89] *See App'x 4*, R1071–79.  It may be that the minutes were approved at a later BOA meeting or via email, but no such approval is contained in the record.

[90] *Id.* R1077–78.

C.  A mixed use development requires coordination and master planning to successfully create a walkable community (see Sec. 21-37-14(10-14) & 21-23-24).  The proposal does not meet this requirement.

D.  The development proposal does not meet the definition of a "Mixed Use Development" as found in 21-37-14(10-14).

    i.  The proposal shows that there has been no effort to coordinate and master plan with surrounding property owners and integrate those existing uses or future development.  After evaluating this proposal within its development area only, and not including the surrounding existing properties and uses, and finds there is not a sufficient mix of uses.

    ii.  The proposal is not of sufficient size and physical improvement to protect surrounding areas and the general community, and to ensure a harmonious integration into the neighborhood.

    iii.  The proposal does not integrate critical massing of physical and functional components into a coherent plan that promotes walkability through uninterrupted pedestrian connections and reduces traffic and parking impacts.

    iv.  The proposal is not designed in a walkable village manner.

    v.  The proposal shows "live/work units" that are not designed to function as such because the spaces are disconnected.  The amount of area designated for "work" within these buildings is too small to function as standalone office space and will likely be utilized for storage and maintenance spaces.

    vi.  The amount of proposed retail uses represents only 6% of the overall building square footage (not including the structured parking areas).

    vii.  The amount of live/work "office" space represents only 1% of the overall building square footage (not including the structured paring areas).

E.  This development proposal is focused on creating a multi-unit dwelling development, which is a use that is not permitted as a standalone unit in the CN Zone (see Sec. 21-8-2).  It does not provide sufficient office/retail elements to serve the purpose of the CN zone (see Sec. 21-[4]-11(6)).

F.  A development that is focused on commercial retail and office uses that harmoniously integrates a residential element into the overall development scope to create a village center would be an appropriate application of a mixed use development (see Sec. 21-[4]-11(6) & 21-23-24).[91]

Magna argues the City's denial of its application was illegal because: (1) the Planning

Commission incorrectly interpreted the LDC in defining "mixed use development"[92]; (2) the

---

[91] *Id.* R1064–65.  The parties agree that the Staff Report references to *LDC* § 21-2-11(6).

[92] *Magna MSJ* at 14–19.

Planning Commission "unlawfully imposed requirements not expressed in the LDC[93]; (3) the Planning Commission erroneously applied the CN's intent statement as a substantive requirement[94]; and (4) the BOA applied the wrong standard of review to the Planning Commission's interpretation of "mixed use development."[95]  Magna also argues the Planning Commission's—and therefore the BOA's—decision was arbitrary and capricious because it was unsupported by substantial evidence in the record.[96]  For the reasons explained below, the court agrees the BOA's decision was illegal because it applied the wrong standard of review, incorrectly interpreted the LDC in defining "mixed use development," and applied the CN's intent statement as a substantive requirement.[97]  The court first addresses BOA's standard of review and then turns to the remaining issues.

## I.        The BOA Used the Incorrect Standard of Review

Citing the BOA's findings, Magna contends the BOA's decision "is illegal because it applied the wrong standard of review to the Planning Commission's Interpretation" rather than "a correctness or *de novo* standard of review.[98]  In response, the City argues the "substance of the [BOA's] decision" "confirms it applied the proper standards."[99]

Under Utah law, a land use decision is illegal if it is "contrary to law."[100]  The LDC provides the standard of review the BOA should apply.  Specifically, the BOA "shall determine

---

[93] *Id.* at 19–20.

[94] *Id.* at 20–22.

[95] *Id.* at 22–23.

[96] *Id.* at 24–26.

[97] Based on this conclusion, the court does not address Magna's argument regarding non-LDC requirements or whether the BOA's decision was unsupported by substantial evidence in the record.

[98] *Magna MSJ* at 22.

[99] *Sandy MSJ* at 47.

[100] Utah Code § 10-9a-801(3)(c)(ii)(C).

the correctness" of the Planning Commission's interpretation and application of a land use ordinance.[101]  With respect to factual issues, the BOA presumes the Planning Commission's decision is correct and "should not interfere with [it] unless it is shown that there is no reasonable basis to justify the action taken . . . [and] the determinations made were so unreasonable as to be arbitrary and capricious."[102]

As the City notes, the BOA discussed this standard several times during the hearing.  For example, BOA member Brown stated whether the Planning Commission used the correct definition for "mixed use development" was a legal question that should be reviewed for correctness and whether the proposal fit the definition was a factual question to be reviewed under an arbitrary and capricious standard,[103] and the BOA's attorney confirmed this framework.[104]  Specifically, the attorney stated the BOA was to "pick" which definition of "mixed use" was correct, and affirmed the BOA should use the "arbitrary and capricious standard" to determine whether the specific proposal meets the proper definition.[105]

It also appears the BOA initially applied the correct standard.  In first making a motion, the BOA had the following discussion:

> Mr. Edwards:  Make a motion to the Planning Commission was correct [sic] in using the different definitions, including number ten, 11, 12, and 13.  And that they did not act in a manner that was arbitrary and capricious — you know what I mean, and we find in favor of the Planning Commission.

---

[101] *LDC* § 21-35-1(h)(1).

[102] *Id.* § 21-35-1(h)(2).

[103] *App'x 5*, R1270.  BOA member Jones also articulates that the motion "ought to be" "whether the Planning Commission applied the correct statute, whether it's the single one here, 11 or the additional ones that that they did apply, and then two, whether they exceeded their authority or acted arbitrarily and capriciously in the decision that they did make."  *Id.* R1284-85.

[104] *Id.* R1283–85; *see also id.* R1283–84 ("So — so board [ph] [sic], just to be clear, there's been conversation about the threshold.  Threshold, the correctness standard.  And then that kind of morphed into the second conversation of — of the if — if multiple standard [sic] apply, then was there enough evidence for the arbitrary capricious. . . .  The threshold that you're taking the code, then you do need to get the second one.").

[105] *Id.* R1273–74.

> Mr. Jones:  And the reasons why you find they didn't — or why you're moving that they didn't act arbitrarily and capriciously.
> Mr. Edwards:  Because they acted according to what they thought there was a proper method of applying the five.
> Mr. Wilcox: If it's helpful to the board, there are some recommendations in as far as findings in our staff report there.  If they if you so find those useful.
> Mr. Jones:  So we have a motion.  Do we have a second?
> Mr. Staker:  Yeah.  I'll second it.[106]

It is not clear if the BOA was incorporating the Report, but the conversation suggests the "substance" of the motion was that the Planning Commission's definition of "mixed use development" was correct and was not applied arbitrarily and capriciously.

However, this motion did not pass.[107]  Brown stated the BOA needed "more robust" findings.[108]  The South Jordan City Attorney pointed to "the recommendations [in] . . . the city's staff report or the brief."[109]  Following some further discussion, Brown made a substitute motion:

> [W]e determine that the Planning Commission did not error [sic] in making its decision.  Based upon the following findings.
> The appellants have not shown that there is no unreasonable basis to justify the action taken, and therefore, that the that the [sic] determinations made were so unreasonable as to be arbitrary and capricious.  In other words, the Planning Commission decision was correct in its interpretation and application of the Land Development Code.
> The Planning Commission decision was reasonable and based upon substantial evidence, including materials referenced by Attorney Alcorn in her rebuttal, including the full and complete record that we have reviewed in this case that was also available to the Planning Commission, including images, studies, scale drawings, things like that.[110]

---

[106] *Id.* R1285–86.

[107] *See id.* R1286–87 (Brown rejects the motion); *id.* R1291 (withdrawing the first motion).

[108] *Id.*

[109] *App'x 5*, R1288.

[110] *Id.* R1290.  Although the transcript states "the determination made were so unreasonable as to be arbitrary and capricious," the court understands this to mean the BOA concluded the Planning Commission's determinations were *not* so unreasonable as to be arbitrary and capricious.

20

The BOA Minutes record the motion as follows:

> [T]he applicant has not met their burden of proving that the Planning Commission decision was so unreasonable as to be arbitrary and capricious.  As stated in the ordinance cited, the appellant bears the burden of proving that the land use authority erred.  It is not enough to show that one could reasonably reach a different conclusion on the facts if there is a reasonable basis for the decision by the Planning Commission.
> Based upon the foregoing, the [BOA] should conclude that the Planning Commission did not err in making their determination that the applicant's proposed project does not meet the definitional standard of a "mixed-use development" as outlined in the [LDC], and adopt the following findings:
> 4. The appellants have not shown there was no reasonable basis to justify the action taken, and therefore that the determinations were made so unreasonable as to be arbitrary and capricious.
> 5. The Planning Commission's decision was correct in its interpretation and application of the [LDC].
> 6. The Planning Commission's decision was reasonable and based upon substantial evidence including materials referenced by attorney Darien Alcorn in her rebuttal, including the full and complete record that has been reviewed in this case and that was available to the Planning Commission, including images, studies, scale drawings, etc.[111]

The second motion, which tracks the recommendations in the Report, passed.[112]

The court acknowledges the motion states "the Planning Commission decision was correct in its interpretation and application of the Land Development code."  However, the BOA's substitute motion, the reference to the Report prior to making the substitute motion, and identical language in the BOA Minutes and the Report lead the court to conclude the BOA either conflated the two standards or applied them in reverse order.  Either the BOA concluded that having a "reasonable basis to justify the Planning Commission's decision" is the same thing as being correct,[113] or the BOA found the Planning Commission's decision was "correct" *because*

---

[111] *App'x 4*, R1082.

[112] *Compare id.*, *with id.* R1074 (Report); *id.* R1083; *App'x 5*, R1290–91.

[113] *See App'x 5*, R1290 ("[T]he determinations made were [not] so unreasonable as to be arbitrary and capricious.  In other words, the Planning Commission decision was correct.").

there was a reasonable basis for its conclusion.[114]  Although the record is not definitive in this

regard, both applications are contrary to the legal standard in the LDC and therefore illegal.[115]

## II.    The BOA's Decision Is Based on an Incorrect Interpretation of the LDC

The BOA affirmed the Planning Commission's six Findings contained in the Report.[116]  As

stated above, Magna argues this decision is illegal because the Planning Commission incorrectly

interpreted the LDC in defining "mixed use development."  Specifically, the Planning

Commission erred in including requirements contained in § 21-23-24 and § 21-37-14(10)-(14)

and in defining "mixed use development."[117]  The court agrees.

### A. The Planning Commission Erred in Including Requirements Contained in § 21-23-24

First, the City acknowledges that the Findings incorporated into the Planning

Commission's decision cite to § 21-23-24, and "further recognizes that it would be

impermissible to impose such requirements on Magna, as its project is not in the MU Zone."[118]

However, the City maintains the Planning Commission's decision was "focused" on the

"definitional standard of mixed use development," not § 21-23-24, and the "lingering references"

are "not reflective of the ultimate decision."[119]  The court disagrees.  The Planning Commission

---

[114] *See App'x 4*, R1082 (adopting the finding that the Planning Commission was correct in its interpretation "based on" its determination that "there [was] a reasonable basis for the decision by the Planning Commission").

[115] *See LDC* § 21-35-1(h) (LDC standard of review); Utah Code § 10-9a-801(3)(c)(ii)(C) (stating a land use decision is illegal if it is "contrary to law").

[116] *See App'x 5*, R1069–70 (the Staff Report explaining the Planning Commission's "mixed use development" analysis based on six findings to the BOA); *id.* R1238–54 (the Planning Commission's attorney explaining the Planning Commission's findings to the BOA); *id.* R1288 (the BOA's attorney referring the BOA to the recommendations on page seven of the Staff Report); *id.* R1290 (stating the BOA determined the Planning Commission did not err in making its decision).

[117] *See generally*, *Magna MSJ.*

[118] *Sandy MSJ* at 42.

[119] *Id.* at 43.

incorporated § 21-23-24 into its definition of "mixed use development" and, to the extend it did, it incorrectly interpreted the LDC.

The Planning Commission's Findings A–C and F specifically reference requirements in § 21-23-24.[120]  The City attempts to distinguish these Findings from the "definitional standard."[121]  However, the Findings reveal what the Planning Commission considered the "definitional standard" to be.  The Staff Report states, "[T]he Planning Commission determined that the request did not meet the definitional standard of a 'mixed use development' as outlined in the LDC, *based on the findings below*."[122]  The Findings list what a mixed use development requires and references the provisions of the LDC those requirements are grounded in.[123]  Only Finding D discusses the "definition of a 'Mixed Use Development' as found in § 21-37-14(10-14)" alone.  If the definitional standard was based only on the § 21-37-14 "mixed use" definitions, there would be no need to include § 21-23-24 as support for concluding the Project failed to meet the definitional standard.  But instead, the Report relies on all six Findings in concluding the Project did not meet the "definitional standard."[124]  Further, the City's attorney explained to the BOA that the Planning Commission applied the five "mixed use" definitions in § 21-37-14 *and* § 21-23-24 in determining what mixed use development means.[125]

---

[120] *App'x 4*, R1069–70.

[121] *Sandy City MSJ* at 42–43.

[122] *App'x 4*, R1069 (emphasis added).

[123] *See id.* R1069–70.

[124] *Id.*

[125] *See, e.g., App'x 5*, R1246–47 (confirming the definition dispute was whether only § 21-37-14(11) applied or whether  "it's *21, 23, 24*, 13 paragraph numbers ten, 11, 12, 13 and 14") (emphasis added); *id.* R1249 (stating the Planning Commission's findings "indicate[d] to [the Planning Commission's attorney] that it thought § 21-23-24 applied").

While it is true that the Findings that reference § 21-23-24 also cite other LDC provisions, it is clear those findings relied, at least in part, on § 21-23-24.[126]  Indeed, the Report explicitly states the Planning Commission determined the "various definitions listed under Sec. 12-37-14(10-14) . . . are the same Mixed Use Development Standards, under Sec. 21-23-24, [and] applied consistently to all mixed use development."[127]  The City's attorney also explained to the BOA that the Planning Commission applied § 21-23-24,[128] but now concedes any application of § 21-23-24 is impermissible.[129]  Accordingly, the BOA erred in affirming Findings A–C and F.

*B. The Planning Commission Erred in Incorporating § 21-37-14(10)-(14)*

Only Finding D relies exclusively on the "mixed use" definitions in § 21-37-14(10)-(14).[130] The City maintains it was correct to define "mixed use development" using all five definitions together.[131]

"The fundamental consideration of interpreting legislation, whether at the state or local level—a city ordinance in this case—is legislative intent."[132]  "The best indicator of legislative

---

[126] *See App'x 4*, R1069–70 (finding (1) "[a] mixed use development must consist of more than just a collection of types of uses that are adjacent (vertically or horizontally) to one another," but must "be designed to function as a walkable village center providing a variety of housing . . ."; (2) "[a] mixed use development is required to function as a walkable village center, providing a mix of uses within close proximity, and uninterrupted pedestrian connections, thereby reducing traffic and parking impacts"; (3) "[a] mixed use development requires coordination and master planning to successfully create a walkable community" (citing § 21-34-14(10)-(14) and § 21-23-24)); *id.* R1070 (finding (6): "[a] development that is focused on commercial retail and office uses that harmoniously integrates a residential element into the overall development scope to create a village center would be an appropriate application of a mixed use development" (citing § 21-34-14(10)-(14) and § 21-23-24)).

[127] *Id.*, R1071.

[128] *See, e.g., App'x 5*, R1246–47 (confirming the definition dispute was whether only § 21-37-14(11) applied or whether "it's 21, 23, 24, 13 paragraph numbers ten, 11, 12, 13 and 14"); *id.* R1249 (stating the Planning Commission's findings "indicate[d] to [the Planning Commission's attorney] that it thought § 21-23-24 applied).

[129] *Sandy MSJ* at 42.

[130] *See App'x 4*, R1069–70.

[131] *Sandy City MSJ* at 27–28.

[132] *RAPS Investments LLC v. North Logan City*, 571 P.3d 238, 243 (Utah Ct. App. 2025) (quoting *Springville Citizens for a Better Cmty. v. City of Springville*, 979 P.2d 332, 337 (Utah 1999)) (citation modified).  "In interpreting the meaning of ordinances, we are guided by the standard rules of statutory construction."  *Thompson v.*

intent is the plain language of the statutes themselves."[133]  "We read the plain language of a statute as a whole and interpret its provisions in harmony with other statutes in the same chapter and related chapters."[134]  Additionally, "[w]hen examining statutory language, we presume that the legislature used each word advisedly."[135]  An "interpretation must be based on the language used," and "[o]missions are assumed to be purposeful."[136]  The court concludes that only § 21-37-14(11) applies for the following reasons: (1) the plain language of the LDC defines "mixed use development"; (2) the structure of the code and definitions suggests the definitions are distinct; and (3) the language in § 21-37-14(10), (12)-(14) mirrors the language of § 21-4-11(14) and § 21-23-24.

1.  The Plain Language of the LDC Defines "Mixed Use Development."

"In order to assess the legislative purpose of a statute, we begin with the language of the statute."[137]  "Where the legislature provides a statutory definition of a term, we apply that definition."[138]  The LDC provides a stand-alone definition of "mixed use development."  Section 21-37-14(11) defines "mixed use development" as:

> a development project that includes residential and one or more of the following land uses: retail, service, commercial, or office; and which, vertically or horizontally, integrates critical massing of physical and functional components

---

*Logan City*, 221 P.3d 907, 911 (Utah Ct. App. 2009) (citation modified); *see also Ogden City Plaza Investors Ltd. v. Ogden City Bd. of Zoning Adjustment*, 514 P.3d 562, 564 (Utah Ct. App. 2022).

[133] *Vineyard Props. of Utah LLC v. RLS Constr. LLC*, 505 P.3d 65, 72 (Utah Ct. App. 2021) (quoting *Hertzske v. Snyder*, 390 P.3d 307, 311 (Utah 2017)).

[134] *Thompson*, 221 P.3d at 911 (cleaned up).

[135] *Vineyard Props. of Utah LLC*, 505 P.3d at 72 (quoting *Colosimo v. Gateway Cmty. Church*, 424 P.3d 866, 882 (Utah 2018) (citation modified)).

[136] *Id.* (first quoting *Arredondo v. Avis Rent A Car Sys., Inc.*, 24 P.3d 928, 931 (Utah 2001); then citing *Colosimo*, 424 P.3d at 882)).

[137] *Colosimo*, 424 P.3d at 882 (Utah 2018) (quoting *State v. Outzen*, 408 P.3d 334, 342 (Utah 2017)); *see also Bagley v. Bagley*, 387 P.3d 1000, 1005 (Utah 2016) ("The best evidence of the legislature's intent is the plain language of the statute itself . . . .") (citation modified).

[138] *Vineyard Props. of Utah LLC*, 505 P.3d at 72.

into a coherent plan that promotes walkability through uninterrupted pedestrian connections, and reduces traffic and parking impacts.[139]

The City argues that because this definition includes the words "commercial," "office," "vertically," and "horizontally," the other "mixed use" definitions contained in § 21-34-14(10), (12)-(14), it therefore properly "glean[ed] the plain meaning" of "mixed use development" by referring to and relying on the "subsidiary statutory definitions."[140]

The City relies on *South Weber City v. Cobblestone Resort LLC*[141] for "this sort of interpretive analysis—in which a municipality's land use code contained nested definitions."[142] The issue in *South Weber* was whether a short term rental (STR) qualified as a permitted use in South Weber's agricultural zone.[143] STRs were not defined or listed as a permitted use in the zone; however, "dwellings, one-family" were allowed,[144] and the appellant argued its STR was a "dwelling, one-family."[145] South Weber's Code "defined 'dwelling' as 'a building designed and used for residential purposes including one-, two-, three- or four- family units, but not including apartments, boarding houses, hotels, and lodging houses or tourist courts.'"[146] To determine whether STRs were also excluded, the district court looked at the definition of "boarding house": a building used for lodging.[147] The South Weber Code did not define "lodging," so the district court applied the "usual meaning" of lodging from two dictionaries to conclude "lodging"

---

[139] *LDC* § 21-37-14(11).

[140] *Sandy MSJ* at 30–31.

[141] 511 P.3d 1207 (Utah Ct. App. 2022).

[142] *Sandy MSJ* at 31.

[143] *South Weber City*, 511 P.3d at 1210–1212.

[144] *Id.* at 1208.

[145] *Id.* at 1211.

[146] *Id.* (citation modified).

[147] *Id.* at 1212.

included STRs.[148]  The Utah Court of Appeals affirmed, concluding the district court properly applied the usual dictionary meaning of "lodging" to ascertain the the meaning of an undefined term.[149]

    Contrary to the City's contention, *South Weber* does not apply nested definitions.  The *South Weber* court looked to the code and consulted dictionaries to ascertain the meaning of an *undefined* term to determine whether a proposed land use—*not specified as permitted or excluded in the applicable zone*—should be permitted or excluded.[150]

    While the *South Weber* definitions had a "textual link"—"lodging"— a textual link or similar language does not, by itself, incorporate one into the other under Utah law.  For example, in *Outfront Media, LLC v. Salt Lake City Corp.*, a billboard owner contested the city's denial of its request to relocate its billboard as illegal "because the city invoked the power of eminent domain to effect a physical taking of [its] billboard without complying with the procedural requirements" of eminent domain.[151]  Pursuant to the billboard compensation statute, the city was considered to have initiated acquisition of a billboard by eminent domain under certain conditions.[152]  The billboard owner argued that because the billboard compensation statute was "alongside a group of statutes that bestow eminent domain power on municipalities"[153] that provide "procedural protections for property owners,"[154] those procedural protections also

---

[148] *Id.*

[149] *Id.*

[150] *Id.* at 1210–12.

[151] *Outfront Media*, 416 P.3d at 391 (citation modified).

[152] *Id.* at 395.

[153] *Id.* at 398.

[154] *Id.* at 396.

applied to "eminent domain" in the billboard compensation statute.[155]  In other words, the "textual link between the Billboard Compensation Statute and the Eminent Domain Statutes" "necessitate[d] compliance with the Eminent Domain Statutes."[156]  In response, the city argued the legislature purposely declined to "incorporate[] the Eminent Domain Statutes by explicit textual reference," and therefore did not intend the eminent domain process for billboards to intersect with the other eminent domain statutes.[157]  The Utah Supreme Court agreed.  It held the procedures contained in the eminent domain statutes did not apply to the billboard compensation statute because it "neither expressly or impliedly incorporate[d] the Eminent Domain Statutes."[158]  Rather, "the Billboard Compensation Statute create[d] a stand-alone scheme that function[ed] without interface with the Eminent Domain Statutes."[159]

This case is more akin to *Outfront Media* than *South Weber*.  The LDC contains a stand-alone definition for "mixed use development" that does not necessitate compliance with the other "mixed use" definitions it sits alongside.  "A dictionary-style definition of a [term], purport[s] to give the full meaning of the term,"[160] and the textual link does not create an aggregate meaning from the five "mixed use" definitions.

2.   The Structure of the Code and Definitions Suggests the Definitions Are Distinct

As the City has aptly noted, courts also look to the "language of the statute as a whole, and interpret its provisions in harmony with other statutes in the same chapter and related

---

[155] *Id.*

[156] *Id.*

[157] *Id.* at 396–97.

[158] *Id.* at 395.

[159] *Id.* at 397.

[160] *Definition*, BLACK'S LAW DICTIONARY (12th ed. 2024).

chapters."[161]  The City argues it properly interpreted "mixed use development" "by reference to, and reliance upon, the subsidiary statutory definitions."[162]  In this case, the court is not persuaded the "mixed use" definitions should be interpreted together based on the LDC as a whole.

First, statutory definitions define a code, not other definitions.  For example, § 10-9a-103 of the Utah Municipal Land Use, Development, and Management Act is listed in the general provisions of Part 1 of the Act and contains definitions for terms "[a]s used in this chapter."[163] Similarly, § 21-37-1, the first section in the "Definitions" chapter of the LDC, states:

> This chapter provides definitions of all land uses *and general terms* used through this title for which a definition is considered necessary.  All land uses allowed by right or by conditional use permit are defined herein.  Some land uses shown on the table and in the definitions are categorical, and many potentially allowable specific land uses are assumed to be included in the categorical definitions.[164]

Section 21-37-1 states the definitions apply to the provisions of the LDC; the definitions are not self-referential.[165]  Additionally, the court interprets the phrase "many potentially allowable specific land uses are assumed to be included in the categorical definitions" to mean that specific *land uses* "for which a definition [was not] considered necessary" are included under the umbrella of the categorial land use, not that "specific land use" definitions are embedded in the categorial definition.

This is further exemplified by the structure of definitions in the LDC.  Many definitions include sub-definitions.[166]  The drafters knew how to structure definitions to clarify uses within a

---

[161] *Bryner v. Cardon Outreach, LLC*, 428 P.3d 1096, 1099 (Utah 2018) (quoting *State v. Barrett*, 127 P.3d 682, 689 (Utah 2005)).

[162] *Sandy MSJ* at 31.

[163] Utah Code § 10-9a-103.

[164] *LDC* § 21-37-1(a) (emphases added).

[165] *See id.*

[166] *See, e.g., id.* § 21-37-3(5) (defining "base station" with subsections further defining what "base station" includes); *id.* § 21-37-5(19) (defining "decorative pole" with subsections outlining further requirements for

category, and the drafters did not include § 21-37-14(10), (12)-(14) as sub-definitions of § 21-37-14(11) to further clarify the requirements contained in "mixed use development." The court presumes this omission is purposeful.[167]

Like the definitions chapter, the land use matrix in § 21-8-2 also includes footnotes that that add or clarify restrictions on land uses in specific districts.[168] For example, footnote 16 specifies that multifamily projects in community commercial districts must "be developed following the RM standards."[169] The LDC drafters could have specified that the "mixed use development" allowed in CNs must incorporate all "mixed use" definitions but it did not. Instead, there is a separate MU District altogether with its own development standards.[170]

At oral argument, the City argued the other "mixed use" definitions must be included in "mixed use development" because they do not appear as separate land uses in the matrix. But the LDC defines land uses as well as "general terms."[171] The other "mixed use" definitions are not land uses, rather they are general terms that appear in other provisions of the LDC. For example, "vertical mixed use" multifamily buildings have a specific height limit,[172] and § 21-23-24 specifies that "vertical and/or horizontal mixed use development shall be determined by the Planning Commission."[173]

---

"decorative poles"); *id.* § 21-37-24(10) (defining "wireless telecommunication facilities" with subsections containing "definitions . . . specific to wireless telecommunications facilities").

[167] *Vineyard Props. of Utah LLC*, 505 P.3d at 72.

[168] *LDC* § 21-8-2(c).

[169] *See id* § 21-8-2(b) ("multifamily, 8 U/A" land use); *id.* § 21-8-2(c)(16); *id.* § 21-4-11(5).

[170] *See id.* § 21-23-24.

[171] *See id.* § 21-37-1(a).

[172] *Id.* § 21-23-4 n.6(a)(1)(i).

[173] *Id.* § 21-23-24(d)(1)(b).

"Mixed use development" has a stand-alone definition and this plain text has no need for "any interpretive gloss."[174] "Where the legislature provides a statutory definition of a term, we apply that definition."[175] Findings A through D rely on all 5 of the "mixed use" definitions in determining whether the Project qualified as "mixed use development."[176] Accordingly, the court concludes the Planning Commission's decision is illegal because it is "based on an incorrect interpretation of a land use regulation."[177]

3. The Language in § 21-37-14(10), (12)-(14) Mirrors the Language of § 21-4-11(14) and § 21-23-24

Comparing the language in the other "mixed use" definitions with the sections defining MU Districts and imposing additional standards for development in MUs further indicate that § 21-37-14(10), (12)-(14) apply to MU Districts alone. The purpose and intent language included in the definition of MU Districts is virtually identical to the purpose and intent language used in § 21-23-24.[178] Significantly, the MU District definition states that they are meant to be "self-sustaining villages,"[179] and development must be in accordance with a master plan[180] and may require a village green.[181] A CN District, on the other hand, is:

> established to allow for the creation of commercial centers to serve the convenience shopping and service needs of neighborhood areas of Sandy City with planned commercial centers. The Neighborhood Commercial District

---

[174] *Vineyard Props. of Utah LLC*, 505 P.3d at 69.

[175] *Id.* at 72.

[176] *Sandy City MSJ* at 27–38.

[177] Utah Code § 10-9a-801(3)(c)(ii).

[178] *Compare LDC* § 21-4-11(14), *with id.* § 21-23-24(1)(a). The only differences are two slight changes in the second subsection—"this zone" in the MU District definition is stated as "these zones" in § 21-23-24, and the MU District definition omits quotation marks around "build to" that are included in § 21-23-24.

[179] *See id.* § 21-4-11(14); *id.* § 21-23-24(a).

[180] *Id.* § 21-23-24(e)(1).

[181] *Id.* § 21-23-24(e)(7).

designation is intended for commercial developments that will relate to residential neighborhoods and will be compatible with residential character.[182]

Unlike the MU District definition, there is no mention of "villages that become walkable neighborhoods."[183]

Additionally, the language included in the other "mixed use" definitions hearkens back to development standards designated as specifically applying to MU Districts. For example, "mixed use, commercial and residential development" and "mixed use, residential and office use," both include "development . . . with an approved ratio, developed according to a *master site plan*"[184] and only development in MUs requires a master plan.[185] Similarly, the "mixed use, horizontal" and "mixed use, vertical" definitions both include "*designed in a village manner*" language.[186] Only mixed use development in MUs refer to "villages."[187] In contrast "mixed use development" is defined as:

> [a] development project that includes residential and one or more of the following land uses: retail, service, commercial, or office; and which, vertically or horizontally, integrates critical massing of physical and functional components into a coherent plan that promotes walkability through uninterrupted pedestrian connections, and reduces traffic and parking impacts.[188]

The "mixed use development" definition does not contain any references to a master plan or village design.[189] Further, the LDC specifically states that "[n]o additional development

---

[182] *Id.* § 21-4-11(6).

[183] *Compare id.* § 21-4-11(6), *with id.* § 21-4-11(14).

[184] *Id.* § 21-37-14(10), (13) (emphasis added).

[185] *See id.* § 21-23-24(e).

[186] *Id.* § 21-37-14(12), (14) (emphasis added).

[187] *See id.* § 21-4-11(14); *id.* § 21-23-24(a).

[188] *Id.* § 21-37-14(11).

[189] *See id.*

standards are required in the CN District (other than all general commercial, office, industrial, and transit corridor development standards contained in this chapter)."[190]

Additionally, "mixed use development" is listed as a conditional use in CN Districts. It is also a conditional use in many other districts, including multiple business and commercial districts, and the Research and Development District.[191] It does not make sense that mixed use development in a business district would also be required to be structured as self-sustaining villages or comply with other the MU development standards.

### III.    The BOA Misinterpreted the CN Intent Statement as a Substantive Requirement

As discussed above, Findings A through D and F all rely on inapplicable provisions of the LDC. This leaves Finding E which states:

> This development proposal is focused on creating a multi-unit dwelling development, which is a use that is not permitted as a standalone use in the CN Zone (see Sec. 21-8-2). It does not provide sufficient office/retail elements to serve the purpose of the CN zone (see Sec. 21-[4]-11(6).[192]

Magna argues that Finding E "unlawfully applie[s] the CN Zone's intent statement as a substantive requirement."[193] The court agrees.

Utah law does not consider a "preamble" provision that states legislative purpose to be a substantive or operative part of a statute.[194] "Preambles" are useful in interpreting legislative

---

[190] *Id.* § 21-23-21(f).

[191] *See id.* §§ 21-8-2, 21-4-11. In addition to CNs, mixed use development is a conditional use in the following Districts: Central Business; Central Business—Parkway; Central Business—Office Subdistrict; Regional Commercial—Planned United Development; Regional Commercial; Boulevard Commercial; Community Commercial; Limited Commercial; and Research and Development. *Id.* §§ 21-8-2, 21-4-11.

[192] *App'x 4*, R1070.

[193] *Magna MSJ* at 20.

[194] *Price Dev. Co., L.P. v. Orem City*, 995 P.2d 1237, 1246 (Utah 2000); *see also Westly v. Bd. of City Comm'rs of Salt Lake City Corp.*, 573 P.2d 1279, 1280 (Utah 1978) (a preamble "confers no substantive rights and is only a manifestation of legislative intent").

intent, but they are "not binding and cannot be read to conflict with the language of the [statute] itself."[195]

Finding E characterizes the Project as multifamily residential development and relies on § 21-4-11(6) to conclude the Project lacks sufficient office and retail elements to qualify as mixed use development.  Section 21-4-11 defines the "commercial, office, and industrial districts," and does not contain any development standards.[196]  Rather, the development standards for CNs are set out in § 21-23-3, the general commercial and industrial development standards, and § 21-23-21(f) which states that "[n]o additional development standards are required for the CN District."[197]  Accordingly, the court determines the Planning Commission incorrectly interpreted the LDC in imposing the CN District definition provision as a development standard.

In sum, the court concludes that all six of the Planning Commission's Findings incorrectly interpreted the LDC.  Because the BOA affirmed the Planning Commission's decision concluding it correctly interpreted and applied the LDC,[198] its decision is illegal, and the court remands the matter to the Planning Commission for a decision consistent with this order.[199]

### IV.    Attorney Fees Are Not Appropriate At This Stage of the Litigation

Magna also argues that, if the court determines the City's decision was illegal, it is entitled to attorney fees and costs pursuant to Utah Code § 13-43-206(12).[200]  The City maintains that

---

[195] *Peabody Twentymile Mining, LLC v. Sec'y of Labor*, 931 F.3d 992, 998 (10th Cir. 2019); *see also Westly*, 573 P.2d at 1280 (preambles do not "lay down . . . rule[s]" respecting the contents of the legislation).

[196] *See id.* § 21-4-11.

[197] *Id.* §§ 21-23-3, 21-23-21(f).

[198] *See App'x 5*, R1290.

[199] *See* Utah Code § 10-9a-801(3)(c)(ii)(A).

[200] *Magna MSJ* at 23–28.

awarding attorney fees is premature because the court has not resolved the petition for judicial review.[201]  This order resolves the petition for judicial review; however, the court declines to award attorney fees at this time.

Section 13-43-206(12) provides that:

> if the . . . Ombudsman issues an advisory opinion . . . and if the same issue that is the subject of the advisory opinion is subsequently litigated in court on a cause of action alleging the same facts and circumstances that are at issue in the advisory opinion, and if the court resolves the issue consistent with the advisory opinion, the court may award the substantially prevailing party reasonable attorney fees and costs pertaining to the development of the cause of action from the date the . . . Ombudsman deliver[ed] the advisory opinion to the date of the court's resolution.[202]

In this case, Magna solicited an advisory opinion from the Ombudsman to determine whether the Project qualified as a "mixed use development" as defined by the LDC.[203]  The Ombudsman specifically addressed whether the City correctly interpreted "mixed use development" using all "mixed use" definitions and concluded it did not.[204]  The court has concluded the same. Accordingly, pursuant to Utah Code § 13-43-206(12), the court could award reasonable attorney fees and costs to Magna.  However, the court declines to exercise its discretionary authority to award attorney fees at this stage of the litigation.[205]  The court remands the matter to the Planning Commission for further proceedings.  Magna may resubmit a request for attorney fees and costs when the matter is fully resolved.

---

[201] *Sandy MSJ* at 56–57.

[202] Utah Code § 13-43-206(12).

[203] *Magna MSJ* Ex. 1.

[204] *See generally*, *id.*

[205] *See* Utah Code § 13-43-206(12).

## V.    The Court Lacks Standing Over Magna's Remaining Claims

Magna requests that the court remand this matter to the Planning Commission but does not address its remaining claims.[206]  However, remanding the petition claim has ramifications for Magna's remaining claims in this court.

Article III courts are courts of limited jurisdiction confined to adjudicating actual cases and controversies.[207]  The case-or-controversy requirement is enforced by Article III standing.[208]  To have standing, a plaintiff must demonstrate three elements: (1) the plaintiff "must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) "the injury has to be fairly traceable to the challenged action of the defendant"; and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."[209]

Magna's remaining claims assert a hypothetical injury that is dependent on the outcome of the remanded petition claim.  Magna asserts essentially one injury—the denial of its conditional use permit application.[210]  Magna seeks to have its application "reviewed and approved," its Project declared a "mixed use development" under the LDC, and a declaration that the City violated the law in denying its application.[211]  Because the court is remanding this matter to the Planning Commission to reevaluate Magna's application, any relief Magna might obtain on its

---

[206] *See Amended Complaint* ¶¶ 159–220 (asserting procedural and substantive due process violations, takings claims, and equal protection violations under the Utah and United States Constitutions).

[207] *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 343 (2006) ("No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.") (cleaned up).

[208] *See id.*

[209] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up).

[210] *See Amended Complaint* ¶¶ 7, 54–65, 160–220 (asserting the City's denial of its application violated Magna's procedural due process, substantive due process, and equal protection rights, and effectuated an unconstitutional taking).

[211] *Id.* ¶¶ 224, 226, 232.

remaining claims is now hypothetical pending the outcome of the Planning Commission's reconsideration. Accordingly, the court determines Magna lacks standing on its remaining claims.

## CONCLUSION

As explained above, the BOA's land use decision is illegal. The court reverses the decision and remands the matter to the Planning Commission to issue a land use decision consistent with this ruling.[212] Plaintiff's Motion for Partial Summary Judgment is GRANTED,[213] and Defendant's Cross-Motion for Partial Summary Judgment is DENIED.[214] Plaintiff's remaining claims are dismissed without prejudice for lack of standing, and the court will retain jurisdiction for the sole purpose of determining attorney fees and costs once the matter is fully resolved.


SO ORDERED this 27th day of October 2025.


BY THE COURT:

_____
ROBERT J. SHELBY
`United States Chief District Judge

---

[212] *See* Utah Code § 10-9a-801(3)(d)(ii).

[213] Dkt. 24.

[214] Dkt. 26.